## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DANIEL GREER

                Plaintiff,

       -v-

CONNECTICUT DEPARTMENT OF
CORRECTION; CHESHIRE CORRECTIONAL
INSTITUTION; and ROLLIN COOK,
Commissioner for the Department of Correction
in the State of Connecticut,

             Defendants.

Civil Action No. 20cv350
MARCH 13, 2020

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    Daniel Greer is a Jewish Inmate at Cheshire Correctional ................................... 3

    B.    Overview of Kosher for Passover Dietary Laws .................................................... 3

    C.    CTDOC's Food Practices ......................................................................................... 7

LEGAL STANDARD.......................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS............................................ 9

    A.    Defendants' Refusal to Provide Kosher Meals Will Substantially Burden
          Plaintiff's Religious Exercise ................................................................................ 10

    B.    Defendants Have Not Met Their Burden of Demonstrating a Compelling
          Government Interest................................................................................................ 11

    C.    Even if Defendants Could Show a Compelling Government Interest, They
          Fail to Use the Least Restrictive Means ............................................................... 14

        1.    Prepackaged Kosher Meals Are a Cost-Effective and Reasonable
             Accommodation for Greer's Dietary Requirements ................................ 14

II.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
       PRELIMINARY RELIEF....................................................................................... 16

III.   THE BALANCE OF EQUITIES TIPS IN RABBI GREER'S FAVOR......................... 17

IV.   ACCOMODATING RABBI GREER'S REQUEST IS IN THE PUBLIC
       INTEREST............................................................................................................... 18

CONCLUSION................................................................................................................... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Stephens*,
  822 F.3d 776 (5th Cir. 2016) ................................................11

*Brandon v. Kinter*,
  938 F.3d 21 (2d Cir. 2019).................................................10

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)..........................................................9

*Dexter 345 Inc. v. Cuomo*,
  663 F.3d 59 (2d Cir. 2011)...............................................16

*Estes v. Clarke*,
  2018 WL 2709327 (W.D. Va. June 5, 2018) .............................11 n. 7

*Ford v. McGinnis*,
  352 F.3d 582 (2d Cir. 2003)..............................................10

*Forde v. Zickefoose*,
  612 F. Supp. 2d 171 (D. Conn. 2009) ......................................1

*Garner v. Kennedy*,
  713 F.3d 237 (5th Cir. 2013) ...........................................13

*Hall v. Klemm*,
  2017 WL 913954 (W.D. Pa. Feb. 1, 2017) ................................12

*Holt v. Hobbs*,
  135 S.Ct. 853 (2015)..............................................11, 12, 14

*Hudson v. Dennehy*,
  538 F. Supp. 2d 400 (D. Mass. 2008) ..................................16

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996)..............................................17

*Jones v. Comm'r, Indiana Dep't of Corr.*,
  2017 WL 3398002 (S.D. Ind. Aug. 8, 2017) .............................15

*Koger v. Bryan*,
  523 F.3d 789 (7th Cir. 2008) ..........................................12

*Lebaron v. O'Brien*,
   2016 WL 5415484 (Mass. Super. Ct. June 15, 2016)............................................................15

*McEachin v. McGinnis*,
   357 F.3d 197 (2d Cir. 2004)..........................................................................................10

*Moussazadeh v. Tex. Dep't of Criminal Justice*,
   703 F.3d 781 (5th Cir. 2012) .................................................................................10, 13

*Muhammad v. Wheeler*,
   171 F. Supp. 3d 847 (E.D. Ark. 2016).......................................................................15

*Murphy v. Zoning Com'n Town of New Milford*,
   148 F.Supp.2d 173 (D. Conn. 2001)...........................................................................17

*Nelson v. Miller*,
   570 F.3d 868 (7th Cir. 2009) ......................................................................................10

*In re Platinum-Beechwood Litigation*,
   378 F.Supp.3d 318 (S.D.N.Y. 2019)..........................................................................18

*Schlemm v. Wall*,
   784 F.3d 362 (7th Cir. 2015) ................................................................................12, 13

*Sherbert v. Verner*,
   374 U.S. 398 (1963).....................................................................................................14

*Shilling v. Crawford*,
   536 F. Supp. 2d 1227 (D. Nev. 2008).........................................................................15

*Tatum v. Meisner*,
   2017 WL 4271657 (W.D. Wis. Sept. 26, 2017) .........................................................13

*Toler v. Leopold*,
   2008 WL 926533 (E.D. Mo. Apr. 3, 2008)..................................................................15

*Trump v. Deutsche Bank AG*,
   943 F.3d 627 (2d Cir. 2019)...........................................................................................8

*United States v. Playboy Entm't Group, Inc.*,
   529 U.S. 803 (2000).....................................................................................................14

*United States v. Sec'y, Fla. Dep't of Corr.*,
   828 F.3d 1341 (11th Cir. 2016) .............................................................................10, 15

*Williams v. Annucci*,
   895 F.3d 180 (2d Cir. 2015).........................................................................................13

*Williams v. Wilkinson*,
  645 F. App'x 692 (10th Cir. 2016) ...................................................................................10

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972).........................................................................................................11

*Wright v. Stallone*,
  2018 WL 671256 (N.D.N.Y. Jan. 31, 2018) .....................................................................18

**Statutes**

42 U.S.C. § 2000cc-1(a) .......................................................................................................1, 9

42 U.S.C. § 2000cc-2(b) .............................................................................................................1

42 U.S.C. § 2000cc-3(g) .............................................................................................................9

Conn. Gen. Stat. §52-571b....................................................................................................9 n.6

## PRELIMINARY STATEMENT

This case involves a straightforward application of the Religious Land Use and

Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1 et seq. and the

Connecticut Religious Freedom Restoration Act, Conn. Gen. Stat. §52-571b ("RFRA").

RLUIPA prohibits the government from substantially burdening the religious exercise of

an institutionalized person, unless the government demonstrates that imposition of the burden is

both "in furtherance of a compelling governmental interest" and "the least restrictive means of

furthering that . . . interest."  42 U.S.C. § 2000cc-1(a); *see also Forde v. Zickefoose*, 612

F.Supp.2d 171, 177 (D. Conn. 2009).  The plaintiff in these cases bears the burden to show that

the challenged regulation or decision imposes a substantial burden on his religious exercise; the

burden then shifts to the defendants to demonstrate a compelling government interest and the use

of least restrictive means.  42 U.S.C. § 2000cc-2(b).

Plaintiff Rabbi Daniel Greer is an inmate at defendant Cheshire Correctional Institution

("Cheshire Correctional"), operated by the Connecticut Department of Correction ("CTDOC")

and overseen by defendant Rollin Cook (collectively, "Defendants").  (Affidavit of Daniel Greer,

dated March 13, 2020 ("Greer Aff.") ¶ 1.)  Rabbi Greer is an Orthodox Jewish Rabbi, and

keeping a kosher diet is a central tenet of his religious beliefs.  (*Id.* ¶¶ 5, 7.)  Defendants,

however, have refused to provide him with meals that are kosher for Passover (April 8 through

nightfall on April 16) and provisions for two ceremonial dinners on the first two nights of

Passover (April 8 and April 9), and their refusal to do so will substantially burden his religious

exercise.  (*Id.* ¶ 3.)  Moreover, given Rabbi Greer's advanced age and declining health, the

failure to provide him with food that is kosher to eat over Passover will force him to choose

between violating his religious beliefs or endangering his life.

CTDOC provides all offenders whose religious dietary needs cannot be met by the

Master Menu, including Rabbi Greer, a so-called "common fare" diet.  (Greer Aff. ¶ 16.)  But the common fare diet is not kosher for Passover, during which special dietary restrictions must be observed in addition to standard kosher rules.  (*Id.* ¶ 19.)  The common fare menu at Cheshire Correctional does not offer kosher for Passover food options to its prisoners.  (*Id.*)  Because it is not possible for Cheshire Correctional to make kosher for Passover food for Plaintiff, anything short of prepackaged kosher for Passover meals will substantially burden Rabbi Greer's religious exercise and violate his First Amendment rights.  (*Id.* ¶ 27.)

It appears CTDOC's sole basis for refusing to provide Rabbi Greer with meals that are kosher for Passover is that doing so would raise "safety concerns."  (Greer Aff. ¶ 25.)  But CTDOC has failed to explain how this is possible given that the prepackaged meals would come from a reputable kosher food vendor and would be no different from every other prepackaged food made available to inmates in this and other prisons, and could undergo the same safety precautions and checks.  (*Id.*)  And even if Defendants could demonstrate a compelling government interest, Defendants would need to use the least restrictive means to deny Rabbi Greer food that is kosher for Passover, and their outright failure to provide him with meals that are kosher for Passover, particularly where prepackaged kosher food is readily available for purchase by CTDOC, is not the least restrictive means.  (*Id.* ¶ 22.)

There is no dispute that Rabbi Greer's religious freedom will be substantially burdened by CTDOC's refusal to provide him with food that is kosher for Passover, and CTDOC cannot meet its burden of showing a compelling government interest implemented through the least restrictive means.  Rabbi Greer therefore can demonstrate a likelihood of success on the merits. Rabbi Greer's inability to practice his religion is a harm that is irreparable and that cannot be compensated by money damages.  And, the balance of the equities and the public interest—as

reflected by Congress' adoption of RLUIPA and Connecticut's adoption of RFRA—also weigh in his favor.  Rabbi Greer is therefore entitled to preliminary injunctive relief.

## BACKGROUND

### A.    Daniel Greer is a Jewish Inmate at Cheshire Correctional.

Plaintiff Daniel Greer is a CTDOC inmate, and has been incarcerated by CTDOC at Cheshire Correctional since December 2019.  (Greer Aff. ¶ 1.)  Rabbi Greer is a practicing Orthodox Jewish and has been an Orthodox rabbi long before he was incarcerated.  (*Id.* ¶ 5.)  He has continued to practice Judaism since becoming a CTDOC inmate.  (*Id.* ¶ 6.)  It is a central tenet of Rabbi Greer's Jewish beliefs that he should eat only kosher food, as mandated by Jewish law.  (*Id.* ¶ 7.)  He has tried to the best extent possible to follow kosher laws while incarcerated.  (*Id.*)  If denied relief, Rabbi Greer will be forced to choose between starving for the eight days of Passover or violating his sincerely held religious beliefs.  (*Id.* ¶ 4.)  Given his advanced age and poor health, this could be a life-threatening decision.  (*Id.*)

### B.    Overview of Kosher for Passover Dietary Laws

Kosher dietary regulations are very detailed and complex, and need to be interpreted and implemented by qualified individuals well-schooled in these laws.  Very generally and by way of overview, the kosher dietary laws (also known as the laws of *kashrut*) are set forth briefly in some verses of the Bible, and have been and continue to be interpreted by expert rabbinic authorities.[1]  These deliberations and decisions are set forth in rabbinic literature that spans a period of thousands of years.[2]

---

[1] *See* http://www.chabad.org/library/howto/wizard_cdo/aid/113425/jewish/What-is-Kosher.htm (last visited March 7, 2020).
[2] *Id.*

The laws of kosher mandate more than just pork-free food and include, among many other things, directives on what food needs to be purchased; how food needs to be stored, prepared, cooked, and served (and these factors all vary by food type and temperature); and how to clean any items that come in contact with the food.[3]   In addition, meat and poultry may not be mixed with dairy products.

Passover commemorates the redemption of the Jewish people from slavery in Egypt, as recounted in the book of Exodus (1:8 – 15:21).  (Declaration of Rabbi Israel Deren, dated March 12, 2020 ("Deren Decl.") ¶ 3.)  After years of enslavement and inhumanity at the hands of the Egyptians, God sent Moses to Pharaoh to demand emancipation.  Pharaoh refused Moses' repeated requests, and God responded by afflicting the Egyptians with ten plagues.  (*Id.*)  These plagues culminated in the death of every firstborn Egyptian male, after which Pharaoh begged Moses to take the Jews out of Egypt. (*Id.*)  A fundamental holiday in Judaism, many Jews who are generally non-observant follow the laws of Passover. (*Id.* ¶ 6.)  In 2020, Passover will be observed from sunset on April 8 through nightfall on April 16.  (Greer Aff. ¶ 9.)

An essential part of Passover observance is adherence to special dietary laws that apply in addition to the standard rules of kosher.  (Deren Decl. ¶ 7.)  The laws of Passover, broadly speaking, require eating unleavened bread (*matza*, pl. *matzot*), avoiding leavened products (*chametz*), and conducting a ceremonial dinner (*seder*) on the first two nights.  (*Id.* ¶ 8.)  The Biblical mandate to celebrate Passover (Exodus 13:3 – 10), specifically mentions eating unleavened bread and remembering the Exodus.  (*Id.*)   Rabbinical decrees have since expounded on these requirements.  (*Id.*)

Throughout Passover, Jews eat unleavened bread.  Jews ate it as slaves, and they took it

---

[3] *Id.*

with them when swiftly escaping Egypt, instead of waiting for their dough to rise.  (Exodus 13:6–7.)  (Deren Decl. ¶ 9.)  From Passover eve through the eighth day of Passover, effectively nine days, Jews may not consume, own, or benefit from leavened products.  Leavened products include any food created by allowing grain (specifically wheat, oat, spelt, rye or barley) and water to ferment and rise, *i.e.*, leaven.  (*Id.* ¶ 10.)

Ashkenazi Jews, such as Rabbi Greer, also refrain from eating *kitniyot*.  This includes, but is not limited to, legumes, corn, and rice.  (Deren Decl. ¶ 11.)  These foods are avoided because they are harvested at the same time as the grains listed above, and some amount of those grains might have mixed in.  (*Id.*)

Not only are leavened products forbidden over Passover, but foods processed on equipment used to produce such products are also prohibited.  Preparing a kitchen for Passover is therefore a substantial undertaking and would be virtually impossible to do at Cheshire Correctional.  (Deren Decl. ¶ 12.)  All leavened products must be removed, and the kitchen cleaned and *kashered*, a process through which surfaces and instruments used to prepare leavened products are made permissible for Passover use.  (*Id.* ¶ 13.)  Generally, this process requires cleaning, waiting 24 hours, and then applying heat by burning or boiling for a set amount of time.  (*Id.*)  Pots, dishwashers, ovens, stoves, sinks and faucets, refrigerators, tables, kitchen gloves, towels, and countertops are all items that must undergo this process.  (*Id.*)

Ovens, for example, must be cleaned, unused for 24 hours, and then heated to 550 degrees Fahrenheit for an hour.  Items with seams or cracks that trap food may need to be blowtorched.  (Deren Decl. ¶ 14.)  Utensils used to cook liquids with leavened products must be cleaned, left idle for 24 hours, placed in a pot of boiling water for 10 seconds, and then rinsed in cold water.  (*Id.*)  The utensils should be immersed one at a time, and the water must return to a

5

boil between each immersion.  (*Id.*)  The pot containing the boiling water should also be kosher for Passover.  Some materials, such as ceramic, cannot be made kosher for Passover at all.  (*Id.*)  And, once the kitchen is cleaned and *kashered*, it would have to remain that way for the entire Passover holiday.  (*Id.*)

The Biblical punishment for eating leavened products on Passover is *kares,* being cut off from the Jewish people (Exodus 12:15.)  (Deren Decl. ¶ 15.)  This severe penalty indicates both the serious nature of the Passover requirements, and that strict Passover observance symbolizes an eternal connection with God and the Jewish people.  (*Id.*)

The third critical portion of Passover observance entails conducting a *seder*, or ceremonial dinner, on the first two nights of Passover.  (Deren Decl. ¶ 16.)  This fulfills the Biblical mandate to remember the Exodus and to eat unleavened bread.  (*Id.*)  The ceremonial dinner also fulfills obligations imposed by rabbinic authorities, including drinking four cups of wine or grape juice, eating bitter herbs, reciting psalms of praise, eating the *afikomen* (an extra piece of unleavened bread to remember the Passover offering), and demonstrating acts of freedom, such as leaning while we eat and sitting with a pillow.  (*Id.* ¶ 17.)  At the meal, a special plate is arranged.  (*Id.* ¶ 18.)  It includes five items: (1) haroses, a mixture of apples, nuts, wine, and cinnamon, which represents the bricks and mortar the Jews used in their labor; (2) a vegetable, preferably parsley, potato, or celery, which will be dipped in salt water that represents the tears of the slaves; (3) bitter herbs, typically romaine or endives, and freshly grated horseradish; (4) a boiled or roasted egg, representing a sacrifice; and (5) a piece of roasted meat, as a reminder of the paschal lamb that was brought when the Temple stood in Jerusalem.  (*Id.*)  Three pieces of unleavened bread are kept next to or within the plate.  (*Id.*)

The dinner follows the service laid out in a religious book called the *haggadah*.  (Deren

Decl. ¶ 19.)  The meal involves, among other things, washing hands, dipping vegetables, and

making blessings.  (*Id.*)  At three points during the meal, one is commanded to eat some portion

of unleavened bread.  (*Id.*)  At four other points, one is obligated to drink a cup of wine or grape

juice.  (*Id.*)

### C.   CTDOC's Food Practices

1.   CTDOC and Cheshire Correctional provide three meal options to Cheshire

Correctional inmates:  the Master Menu, therapeutic diet, and common fare diet.  CTDOC's

Food Service Manual defines the common fare diet as "[a] diet which meets all nutritional

requirements and reasonably accommodates recognized religious dietary restrictions."[4]  Rabbi

Greer is forced to participate in the common fare meal plan for lack of a better option.  (Greer

Aff. ¶ 18.)  The food on the common fare meal plan is generally not kosher, although certain

products are.  (*Id.*)  Rabbi Greer survives by eating those kosher products on the common fare

menu, supplemented by additional kosher foods purchased by him from the commissary.  (*Id.*)

Upon information and belief, the meal plans currently offered by CTDOC at Cheshire

Correctional, including the common fare meal plan, do not comply with Orthodox Jewish kosher

laws for Passover and are, therefore, not in any way acceptable as substitutes or alternatives to a

kosher diet for Rabbi Greer during Passover.  (Greer Aff. ¶ 19.)  Making a kitchen kosher

generally involves the thorough ritual cleaning of all kitchen surfaces, appliances, and items in

accordance with specific kosher rules.  (Deren Decl. ¶¶ 12–15.)  These rules become even more

stringent when koshering a kitchen for Passover.[5]  However, Cheshire Correctional conducts no

special cleaning whatsoever of the common fare kitchen prior to Passover.  (Greer Aff. ¶ 19.)

---

[4] Connecticut Department of Correction Administrative Directive Number 10.18, Effective Date 6/24/2015 (Ex A).
[5] To make even the most mundane kitchen kosher-for-Passover is truly a difficult task, and the procedures are
intricate and complex and require expertise and supervision to be done correctly.  In any kitchen, all interior surfaces
of the oven and stove top must be treated with a blow torch, and the oven itself must be made to glow red hot for a

Appropriate prepackaged meals, including special ones for the ceremonial dinners, readily available for purchase by CTDOC, are the easiest way for CTDOC to provide Rabbi Greer with Passover accommodations.  (Greer Aff. ¶ 21.)

Upon information and belief, the Aleph Institute can easily arrange for prepackaged kosher for Passover food and ceremonial dinner materials to be delivered to Cheshire Correctional in time for Passover 2020.  (Declaration of Rabbi Menachem M. Katz, dated March 11, 2020 ¶ 5.)  The Aleph Institute is an Orthodox Jewish organization that, among other things, addresses the spiritual needs of Jewish inmates in correctional facilities throughout the country. (*Id.* ¶ 2.)  Rabbi Greer has made a formal request for CTDOC to provide prepackaged meals for Passover through the prison commissary, but the request has not been honored.  (Greer Aff. ¶ 24.)  Upon information and belief, CTDOC will provide Rabbi Greer with only a box of unleavened bread and some tuna fish, which will not even be sufficient for ordinary meals over the course of nine days, let alone satisfy the requirements of Passover.  (*Id.* ¶ 20.)

## LEGAL STANDARD

A party seeing a preliminary injunction must demonstrate that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 640 (2d Cir. 2019) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

---

specified period.  Every exposed portion of the outside surface of the oven, stove top, counter top, cabinet shelves, storage shelves—every exposed surface everywhere in the kitchen area, except for the ceiling, floor, and all manner of doors—must be cleaned and then covered.  All manner of utensils, made of metal and glass, and all pots, pans, plates, cups, and dishes must be placed in boiling water under proper supervision for a specified time so that all traces of bread, grain, or any substance that may have or could have been subject to leavening is destroyed.  Special rules apply to ceramics.  (Deren Decl. ¶ 12–14.)

## ARGUMENT

## I.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

Congress unanimously passed the Religious Land Use and Institutionalized Persons Act,

42 U.S.C. § 2000cc-1(a), to eliminate "unnecessary" barriers to religious exercise.  *Cutter v.*

*Wilkinson*, 544 U.S. 709, 716 (2005).  Under the RLUIPA,

> No government shall impose a substantial burden on the religious exercise of a
> person residing in or confined to an institution … even if the burden results from
> a rule of general applicability, unless the government demonstrates that
> imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental
> interest.[6]

42 U.S.C. § 2000cc-1(a).  RLUIPA specifically provides that it "shall be construed in favor of a

broad protection of religious exercise, to the maximum extent permitted by the terms of this

chapter and the Constitution."  42 U.S.C. § 2000cc-3(g).

As set forth below, Defendants' refusal to serve food that is kosher for Passover and

provisions for two ceremonial dinners on the first two nights of Passover to Jewish inmates with

Rabbi Greer's religious beliefs will be a substantial burden on Rabbi Greer that is not justified by

a compelling government interest, and, assuming *arguendo* such interest exists, is not the least

restrictive means of furthering that interest.

---

[6] The Connecticut Religious Freedom Restoration Act, CT Code § 52-571b, provides, similar to RLUIPA, that "the
state or any political subdivision of the state shall not burden a person's exercise of religion … even if the burden
results from a rule of general applicability, except…if it demonstrates that application of the burden to the person (1)
is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that
compelling governmental interest."  Because the RLUIPA and Connecticut RFRA are virtually identical, apart from
the fact that the Connecticut RFRA requires only a showing of a "burden" rather than a "substantial burden" on a
person's free exercise of religion, the Court should apply the same standard to Rabbi Greer's Connecticut RFRA
claims as it applies to his RLUIPA claims.

### A.    Defendants' Refusal to Provide Kosher Meals Will Substantially Burden Plaintiff's Religious Exercise.

The Second Circuit, along with many other courts, has ruled that denial of kosher food may place a substantial burden on religious exercise for the simple reason that it gives Rabbi Greer the choice of violating his religious practices or not eating.  *See Brandon v. Kinter*, 938 F.3d 21, 35 (2d Cir. 2019) ("In the context of religious feasts and fasting, our Circuit has previously held that a small number of noncompliant meals—even a single violation—can be a substantial burden."); *see also Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003) (holding that plaintiff's religious beliefs were substantially burdened by his inability to participate in Eid al-Fitr feast); *McEachin v. McGinnis*, 357 F.3d 197 (2d Cir. 2004) (holding that seven-day restrictive diet was a substantial burden when it was imposed during Ramadan and therefore interfered with Muslim prisoners' breaking of the fast).

Other Circuit Courts agree.  *See, e.g.*, *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 793 (5th Cir. 2012), *as corrected* (Feb. 20, 2013) ("Denying all access to kosher food places a substantial burden on the practice of an inmate's faith."); *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341, 1346 (11th Cir. 2016) ("The Secretary concedes that the United States met its burden of proving that the denial of kosher meals is a substantial burden on the religious exercise of a prisoner in the custody of the Secretary."); *Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009), *abrogation recognized by Jones v. Carter,* 915 F.3d 1147 (7th Cir. 2019) ("We have held that a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition."); *Williams v. Wilkinson*, 645 F. App'x 692, 702 (10th Cir. 2016) ("[T]he failure to provide Mr. Williams with a kosher diet will either prevent him from exercising his sincerely held religious belief or force

him to make the Hobson's choice of eating a diet contrary to his beliefs or not eating at all.").[7]

Here, Rabbi Greer asserts that his exercise of his Jewish religion will be substantially burdened by CTDOC's policies with respect to food that is kosher for Passover. (Greer Aff. ¶ 27.) In particular, none of the common fare menu options meets the requirements of kosher for Passover food as they are not prepared in accordance with dietary laws specific to Passover, and CTDOC does not provide any of the items necessary for conducting two ceremonial *seder* dinners, as required by Jewish law. (Greer Aff. ¶¶ 24–25.) Therefore, the burden of proof shifts to Defendants to prove that CTDOC's restrictions are the least restrictive means of furthering a compelling government interest. *Holt v. Hobbs*, 135 S.Ct. 853, 863 (2015). Defendants cannot meet that very high burden.

### B.    Defendants Have Not Met Their Burden of Demonstrating a Compelling Government Interest.

The Supreme Court has held that "compelling governmental interests" are those "of the highest order" that protect public health, safety, or welfare. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). RLUIPA's compelling interest standard requires "a fact-intensive inquiry into the particular costs and risks that the requested exemption engenders." *Ali v. Stephens*, 822 F.3d 776, 784 (5th Cir. 2016) (citation omitted). "[T]he court does not ask if the challenged policy, in general, furthers a compelling governmental interest in security and costs." *Id.* at 785. Rather, "RLUIPA requires us to scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context." *Holt*, 135 S.Ct. at 863 (citing *Burwell v. Hobby*

---

[7] In *Estes v. Clarke*, No. 7:15-cv-00155, 2018 WL 2709327 (W.D. Va. June 5, 2018), the state submitted an affidavit from Rabbi Robert Schectman, the former Chaplain of CTDOC who also has testified on behalf of CTDOC in other kosher food litigation. Schectman, who does not appear to be an Orthodox Jew, testified that Virginia's common fare menu was, in essence, kosher enough. The court held that the state had violated RLUIPA by failing to provide the prisoner with kosher food, effectively giving Schectman's testimony no weight. *See id.* at *7.

*Lobby Stores, Inc.*, 134 S.Ct. 2751, 2779 (2014) (quotation marks omitted)).

Defendants cannot show a compelling government interest in failing to serve Rabbi Greer and other Jewish inmates food that is kosher for Passover.  At most, we understand that CTDOC has suggested that prepackaged kosher for Passover meals are not something it is willing to provide because it cannot ensure the safety of the food.  (Greer Aff. ¶ 25.)  This excuse is nonsense.  These meals are prepared by reputable, well-known kosher food vendors and would be no different from every other prepackaged food made available to inmates in the prison or the commissary, and could undergo the same safety precautions and checks.  Upon information and belief, these prepackaged kosher meals are also made available in other correctional institutions, and similar security procedures can be followed at Cheshire Correctional.  (*Id.*)  CTDOC proffers no other supposed justification for its refusal to provide prepackaged kosher for Passover meals and, thus, cannot show a compelling government interest.  *See, e.g.*, *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015) (allowing prisoner's case to proceed where government "has not tried to estimate what it would cost to honor Schlemm's request; expense may be negligible if he finds a vendor to provide a sealed platter of food acceptable"); *Koger v. Bryan*, 523 F.3d 789, 800 (7th Cir. 2008) ("The prison officials failed to show what effort would have been involved in providing a meatless diet to Koger, how this would have hampered prison administration, or how the clergy verification furthered any interest not already satisfied by Koger's submissions."); *Hall v. Klemm*, No. 15-20 E, 2017 WL 913954, at *13 (W.D. Pa. Feb. 1, 2017), *report and recommendation adopted*, No. 15-20, 2017 WL 913803 (W.D. Pa. Mar. 7, 2017) ("[Defendants'] stated interest in simplifying food services cannot be considered compelling, given the lack of any evidence to suggest that Plaintiff's dietary request has placed a particularly onerous burden on the institution.").

While genuine safety issues in prisons can constitute an important governmental concern, CTDOC cannot rely on "bare assertions" of such to establish a compelling government interest in denying Rabbi Greer kosher for Passover meals. *Moussazadeh*, 703 F.3d at 794 (holding that Defendant Texas Department of Criminal Justice had failed to produce evidence of security concerns related to providing kosher food at prison where Defendant did not offer evidence that inmates would be more likely to cause violence or safety disturbance if some inmates received kosher meals); *see also Williams v. Annucci*, 895 F.3d 180, 190 (2d Cir. 2015) (noting that under RLUIPA, "government's compelling interest must be defined at an appropriately reduced level of generality" and government must "demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened.") (citing *Holt*, 135 S.Ct. at 863).

Even if ensuring the safety of prepackaged meals would incur additional labor and costs for CTDOC, "[s]aving a few dollars is not a compelling interest, nor is a bureaucratic desire to follow the prison system's rules." *Schlemm*, 784 F.3d at 365. "RLUIPA may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Garner v. Kennedy*, 713 F.3d 237, 245 (5th Cir. 2013) (quoting RLUIPA Rules of Construction, 42 U.S.C.A. § 2000cc-3(c)) (quotation marks omitted).

Defendants have suggested an interest in preventing the appearance of "special treatment" for Rabbi Greer. But Defendants already provide specialized "therapeutic" diets to prisoners with particular dietary needs, and have not cited violent or disruptive incidents stemming from these accommodations,[8] and the law is clear that concerns for special treatment are not a compelling government interest. *See Tatum v. Meisner*, No. 13-cv-44-wmc, 2017 WL

---

[8] Connecticut Department of Correction Administrative Directive Number 10.18, Effective Date 6/24/2015.

4271657, at 5 (W.D. Wis. Sept. 26, 2017) (finding that Defendants had not met their burden of demonstrating that denial of Nation of Islam-compliant diet was least restrictive means of furthering compelling government interest where other inmates received specialized food for medical or religious reasons).  Indeed, if the government were able to claim a compelling government interest in avoiding special treatment every time a prisoner made a request for religious accommodation, RLUIPA would cease to have any meaning.

**C.    Even if Defendants Could Show a Compelling Government Interest, They Fail to Use the Least Restrictive Means.**

To satisfy the "least restrictive means" requirement, Defendants must establish that "no alternative forms of regulation" would further the governmental interest.  *Sherbert v. Verner*, 374 U.S. 398, 407 (1963).  "[I]f a less restrictive means is available for . . . [g]overnment to achieve its goals . . . g]overnment must use [that means]."  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 815 (2000).  "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party."  *Holt*, 135 S.Ct. at 864 (citation omitted) (quotation marks omitted).

**1.    Prepackaged Kosher Meals Are a Cost-Effective and Reasonable Accommodation for Greer's Dietary Requirements.**

Even if Defendants could show that providing Rabbi Greer with kosher for Passover food or provisions for two ceremonial dinners on the first two nights of Passover would create food safety issues rising to the level of implicating a compelling government interest, they cannot show that their utter failure and refusal make such religious accommodations is the least restrictive means of achieving that goal.  CTDOC already offers three different meal options

14

year-round.[9]  Defendants therefore fail to show that not serving any kosher for Passover meals at

all is less restrictive than offering prepackaged kosher meals to Jewish inmates at Cheshire

Correctional.  *See, e.g.*, *Sec'y, Fla. Dep't of Corr.*, 828 F.3d at 1349 ("[T]he Secretary fails to

explain why the Department cannot offer kosher meals when it offers vegan, medical, and

therapeutic diets at similar marginal costs."); *Lebaron v. O'Brien*, No. 15-00275, 2016 WL

5415484, at 13 (Mass. Super. Ct. June 15, 2016) ("Director Gendreau's affidavit merely explains

why provision of the Holy Diet would be burdensome; it does not constitute evidence of the

prison's consideration and reasoned rejection of other means of satisfying the plaintiffs' dietary

requests."); *Toler v. Leopold*, No. 2:05CV82 JCH, 2008 WL 926533, at 3 (E.D. Mo. Apr. 3,

2008) ("[T]he Court finds Defendants' speculations regarding the increased risk associated with

providing kosher food to be undermined by the undisputed fact that Defendants have provided

numerous alternative menus for medical reasons without incident or impact.").

Other courts have found the existence of a prepackaged alternative to be evidence that the

denial of a religious diet is a violation of the RLUIPA.  *See, e.g.*, *Jones v. Comm'r, Indiana*

*Dep't of Corr.*, No. 1:16-cv-2887-WTL-MJD, 2017 WL 3398002, at 3 (S.D. Ind. Aug. 8, 2017)

("[T]he provision of the pre-packaged kosher meal tray already available at those facilities

without kosher kitchens will be minimally burdensome to the Defendant."); *Muhammad v.*

*Wheeler*, 171 F. Supp. 3d 847, 857 (E.D. Ark. 2016) ("[I]f [plaintiff] claims that offering a

pescatarian meal plan would no longer place a substantial burden upon his religious exercise,

[defendants] must show how refusing to provide such a plan furthers a compelling government

interest and is the least restrictive means of doing so."); *Shilling v. Crawford*, 536 F. Supp. 2d

1227, 1234 (D. Nev. 2008) ("Defendants have offered no evidence they considered alternatives

---

[9] Connecticut Department of Correction Administrative Directive Number 10.18, Effective Date 6/24/2015.

to a transfer, such as providing pre-packaged or frozen kosher meals."); *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 411 (D. Mass. 2008) (granting judgment for prisoner plaintiff where "As with Kosher foods, there are available vendors willing and able to provide pre-packaged Halal-certified meals in quantities sufficient to serve the 50 to 90 Muslim inmates at MCI–CJ that Acting Superintendent Marshall estimated might request such meals.").  This Court should do the same here.

## II.   PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

An irreparable injury is "an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation."  *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (internal citations and quotations omitted).  Keeping kosher is a central tenet of Judaism observed by Rabbi Greer, and Passover is one of the most important and widely celebrated holidays in the Jewish faith.  According to Rabbi Greer's religious beliefs, as set out in the Bible, the punishment for eating leavened products on Passover is *kares,* being cut off from the Jewish people.  (Greer Aff. ¶ 13.)  This severe penalty indicates both the serious nature of the Passover requirements, and that strict Passover observance symbolizes an eternal connection with God and the Jewish people.  (*Id.*)

As explained in detail in the above sections, CTDOC's and Cheshire Correctional's refusal to provide Rabbi Greer with meals that are kosher for Passover and provisions for two ceremonial dinners on the first two nights of Passover will cause Rabbi Greer irreparable harm by forcing him to either violate his religious beliefs or, in the case of kosher for Passover food, go without food for eight days, an extremely dangerous proposition for an elderly man in declining health, like Rabbi Greer.  (Greer Aff. ¶ 4.)  The ensuing harm would be spiritual, emotional, and likely physical, and could not be compensated monetarily.  Such an abrogation of

16

Rabbi Greer's right to free religious exercise is more than sufficient to satisfy the "irreparable harm" prong of the preliminary injunction standard.  *See, e.g.*, *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (finding conclusion that inmate would suffer irreparable harm in absence of injunction against continued confinement in medical keeplock was supported in part by finding that inmate was substantially likely to demonstrate violations of his right to free exercise of his religious beliefs under RFRA; "[a]lthough the plaintiff's free exercise claim [under RFRA] is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily."); *Murphy v. Zoning Com'n Town of New Milford*, 148 F.Supp.2d 173, 180–181 (D. Conn. 2001) (holding that claim of RLUIPA violation was sufficient in itself to satisfy "irreparable harm" requirement; "[s]ince [RLUIPA] was enacted for the express purpose of protecting the First Amendment rights of individuals, the allegation that defendants have violated this statute also triggers the same concerns that led the courts to hold that these violations result in a presumption of irreparable harm.").

In 2020, Passover will be observed beginning at sunset on April 8 and ending at nightfall on April 16.  (Deren Decl. ¶ 24.)  Given that less than a month remains before the holiday begins, and that Rabbi Greer will remain an inmate at Cheshire Correctional through Passover (and, barring unforeseen circumstances, through many Passovers to come), the harm Rabbi Greer faces is actual, imminent, and irreparable.

## III.    THE BALANCE OF EQUITIES TIPS IN RABBI GREER'S FAVOR.

In each case seeking a preliminary injunction, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *In re Platinum-Beechwood Litigation*, 378 F.Supp.3d 318, 326 (S.D.N.Y. 2019) (quoting *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010).)  Here, Rabbi Greer is facing

17

a substantial harm:  the loss of his right to free exercise of religion.  *See Wright v. Stallone*, No. 9:17-cv-0487 (LEK/TWD), 2018 WL 671256, at9 (N.D.N.Y. Jan. 31, 2018) (holding that Plaintiff, a practicing Muslim inmate who was denied the ability to go off to an unoccupied area of the yard to pray his *salaah*, faced "substantial" hardship while prison's hardship was minimal).  Defendants, conversely, face only the "hardship" of giving negligible logistical consideration to the purchase of prepackaged kosher for Passover meals, particularly since such meals could be offered at the prison commissary at no cost to Defendants.  (Greer Aff. ¶ 24.)

## IV.    ACCOMODATING RABBI GREER'S REQUEST IS IN THE PUBLIC INTEREST.

Finally, the Court must consider whether the requested relief is in the public interest. *Platinum-Beechwood Litigation*, 378 F.Supp.3d 318 at 326.  While courts will generally assume that a governmental entity acts in the interest of the public it serves, in this case protecting Rabbi Greer's constitutional rights is in the public interest, while "it is decidedly against the public interest to permit the enforcement of an unconstitutional policy or law."  *Wright*, 2018 WL 671256 at *9.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Daniel Greer respectfully requests that the
Court grant him preliminary injunctive relief enjoining Defendants to provide him with
prepackaged kosher for Passover meals and provisions for two ceremonial dinners on the first
two nights of Passover (April 8 and April 9).

Respectfully submitted,

By: /s/ Jonathan J. Einhorn

Jonathan J. Einhorn
JONATHAN J. EINHORN LAW OFFICES
129 Whitney Avenue
New Haven, CT 06510-1223
Telephone:  203.777.3777
Facsimile:   203.782.1721
E-mail:       einhornlawoffice@gmail.com

Joel C. Haims (*pro hac vice* admission pending)
Steve Rappoport (*pro hac vice* admission pending)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Telephone:  212.468.8000
Facsimile:   212.468.7900
E-mail:       jhaims@mofo.com
E-mail:       srappoport@mofo.com

*Attorneys for Plaintiff Daniel Greer*

Exhibit A

| State of Connecticut<br>Department of Correction | Directive Number<br>10.18 | Effective Date<br>6/24/15 | Page 1 of 4 |
|---|---|---|---|
| **ADMINISTRATIVE DIRECTIVE** | Supersedes | Food Services, dated 1/1/2010 | |
| Approved By<br><br>Commissioner Scott Semple | Title<br><br>Nutrition and Food Services | | |

1. <u>Policy</u>. Department of Correction facilities shall serve nutritious meals in a cost-effective manner while maintaining high levels of security, safety and sanitation. The quality of food services shall be maintained at the highest level and subject to an inspection and reporting program.

2. <u>Authority and Reference</u>.

    A. Connecticut General Statutes, Sections 18-81 and 19a-36.
    B. Regulations of Connecticut State Agencies, Section 19-13-B42.
    C. Public Health Code Regulations, Sections 19-13-B42 and 19-13-B77.
    D. National School Lunch Act (42 U.S.C. 1751).
    E. Administrative Directive 2.7, Training and Staff Development.
    F. American Correctional Association, Standards for the Administration of Correctional Agencies, Second Edition, April 1993, Standard 2-CO-4C-01.
    G. American Correctional Association, Standards for Adult Correctional Institutions, Fourth Edition, January 2003, Standards 4-4313 through 4-4328 and 4-4380.
    H. American Correctional Association, Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, June 2004, Standards 4-ALDF-4A-03 through 4-ALDF-4A-10.

3. <u>Definitions</u>. For the purposes stated herein, the following definitions apply:

    A. <u>Common Fare</u>. A diet which meets all nutritional requirements and reasonably accommodates recognized religious dietary restrictions.
    B. <u>Master Menu</u>. A 28-day menu cycle set up to meet or exceed the Recommended Dietary Allowance (RDA) for all populations assessed.
    C. <u>Registered Dietician</u>. A person, who meets requirements for membership in the American Dietetic Association, has successfully completed the examination for registration and maintains continuing education requirements.
    D. <u>Therapeutic Diet</u>. A diet specially prescribed by a physician for medical reasons.

4. <u>Nutritional Services Operations Manual</u>. The Correctional Chief of Food Services shall develop and maintain a manual detailing the operation of the Nutrition and Food Services Unit. The manual shall be submitted to the Deputy Commissioner of Administration for annual review and approval.

5. <u>Administrative Responsibilities</u>.

    A. <u>Correctional Chief of Food Services</u>. The Correctional Chief of Food Services shall oversee and coordinate the food service function for the Department and provide technical supervision to each facility. The Correctional Chief of Food Services shall directly supervise the Food Production Manager and District Food Service Managers.
    B. <u>District Food Service Manager</u>. Each District Food Service Manager shall:

| Directive Number 10.18 | Effective Date 6/24/15 | Page 2 of 4 |
|---|---|---|
| Title | Nutrition and Food Services | |

    1.     supervise and oversee the facilities assigned;
    2.     conduct annual food service audits;
    3.     conduct monthly inventory audits;
    4.     review all facility purchases;
    5.     monitor and schedule training for staff;
    6.     conduct counseling and disciplinary action;
    7.     monitor and maintain monthly food costs;
    8.     oversee the food service staff and staff cost;
    9.     maintain cleanliness and sanitation;
    10.    complete any necessary reports (e.g., Site Visit Report, etc.); and,
    11.    implement the master menu and therapeutic diets.

Each District Food Service Manager shall report to the Correctional Chief of Food Services, and consult with the Unit Administrators on matters pertaining to the facility food service functions and shall report through the Correctional Chief of Food Services on matters pertaining to the daily food service operation.

C.    <u>Food Production Manager</u>. The Food Production Manager shall:

    1.     supervise the daily operation of the production kitchen,
    2.     oversee the food and operational cost,
    3.     monitor and maintain equipment (preventative maintenance),
    4.     maintain cleanliness and sanitation,
    5.     oversee the training of staff,
    6.     complete any necessary reports,
    7.     consult with the Correctional Chief of Food Services on matters pertaining to the food service function; and,
    8.     report through the chain of command on matters pertaining to the daily food service operation.

D.    <u>Lead Food Service Supervisor</u>. Each facility with on-site food preparation shall have a Food Service Supervisor who shall supervise the food service operation of the facility. The Lead Food Service Supervisor shall be responsible for the daily operation of the facility's kitchen and all related reports. Each Lead Food Service Supervisor shall report to their assigned District Food Service Manager.

6.    <u>Menu Planning</u>.

A.    <u>Master Menu</u>. The Master Menu shall be developed by the Correctional Chief of Food Services with input from the District Food Service Managers and Lead Food Service Supervisors. The Master Menu shall be approved by the Correctional Chief of Food Services and a Registered Dietician.

B.    <u>Master Menu Planning Criteria</u>. The Correctional Chief of Food Services shall prepare menus considering nutritional adequacy, inmate preferences, costs, physical lay out, cost of equipment and staff complement, variety in method of preparation and frequency and other relevant factors to good dietary practice. Preparation shall consider food flavor, texture, temperature, appearance, and palatability.

| Directive Number 10.18 | Effective Date 6/24/15 | Page 3 of 4 |
|---|---|---|
| Title | | |
| Nutrition and Food Services | | |

    C.    <u>Common Fare</u>. Each facility shall adhere to the guidelines of the common fare program in accordance with the Nutritional Services Operations Manual.

    D.    <u>Menu Adjustments</u>. Each facility shall request approval for any adjustments to the Master Menu from the District Food Service Manager or the Correctional Chief of Food Services. All food preparation shall follow standard recipes as developed by the Correctional Chief of Food Services.

7.    <u>Security</u>. The food preparation, serving, and dining areas shall be maintained at a high level of security. Staff shall be trained in security procedures prior to assignment in accordance with Administrative Directive 2.7, Training and Staff Development.

8.    <u>Cycle Menu</u>. The Department shall operate on a four (4) week cycle menu which shall be distributed in advance of actual use to facilitate the ordering of food and supplies and to ensure a continuity of supplies.

9.    <u>Therapeutic Diets</u>. The therapeutic dietary requirements as prescribed by the facility physician shall be produced in accordance with the Nutritional Services Operations Manual. Any deviations shall require the approval of the Correctional Chief of Food Services in consultation with a registered dietician.

10.    <u>Sanitation</u>. Food preparation, serving and dining areas shall be maintained at a high level of cleanliness and inspected for cleanliness before and after each meal in accordance with Public Health Code Regulations. Personnel involved in food preparation and serving shall maintain a high level of personal hygiene, wear protective headgear and gloves, be trained in appropriate sanitary regulations prior to assignment, and wash their hands at the start of each shift, throughout the shift as needed and upon any use of toilet facilities.

11.    <u>Food Service Requirements</u>. Food service requirements shall be followed in accordance with Public Health Code regulations. Portion controls shall be according to the Master Menu requirements. The time and temperature requirements between food preparation and service shall be kept within the guidelines for safe food handling procedures in accordance with the Nutritional Services Operations Manual and Public Health Code Regulations. All inmates shall be served the regular menu with the only exceptions being those authorized for therapeutic diets or common fare menu. Food shall not be withheld or used as a disciplinary measure or sanction. Except for emergencies or as approved in writing by the Deputy Commissioner of Administration, three (3) meals shall be served in each 24-hour period of which at least one (1) meal shall contain a hot entree. Not more than 14 hours shall elapse between the evening meal and breakfast.

12.    <u>Meal Records</u>. In the event an issue arises regarding a particular meal, the Shift Commander or designee shall complete form CN 101801, Food Service Report to the Unit Administrator and forward the report to the Unit Administrator for review. The Unit Administrator shall forward the report, with any comments, to the Correctional Chief of Food Services for review and appropriate action. Other record keeping shall be in accordance with the Nutritional Services Operations Manual.

| Directive Number<br>10.18 | Effective Date<br>6/24/15 | Page 4 of 4 |
|---|---|---|
| Title<br>Nutrition and Food Services | | |

13. <u>Food Service Audits</u>. Each District Food Service Manager shall perform an annual food service audit at each facility assigned to the manager utilizing form CN 101802, Food Service Audit and forward the results and/or findings to the Correctional Chief of Food Services and Unit Administrator. The District Food Service Manager shall conduct three (3) quarterly Focused Food Service Inspections. Such inspections shall be documented utilizing Attachment-A, Focused Food Service Inspection Report and forward the results and/or findings to the Correctional Chief of Food Services and Unit Administrator. The Unit Administrator in conjunction with the Lead Food Service Supervisor shall be responsible for correcting any deficiencies noted in the audit.

14. <u>Inventory Control</u>. The Lead Food Service Supervisor shall maintain and monitor a food inventory necessary for the daily operation of the food service department. Once a month, an inventory shall be conducted and accumulation of receipts tallied to derive a food cost. Requisition forms shall be completed to ensure accountability of food leaving the kitchen, aside from the normal use for production.

15. <u>Forms and Attachments</u>. The following forms are applicable to this Administrative Directive and shall be utilized for the intended function:

    A.    CN 101801, Food Service Report to the Unit Administrator; and,
    B.    CN 101802, Food Service Audit.
    C.    Attachment-A, State of Connecticut Department of Public Health Focused Food Service Inspection Report (Pages 1-3)

16. <u>Applicability to inmates housed at Manson Youth Institution and York Correctional Institution</u>. The provisions of this Administrative Directive may be changed on a facility specific basis to accommodate the management of inmates under the age of 21 as requested by the Unit Administrators of Manson Youth Institution and York Correctional Institution. Such changes Shall be approved by the Commissioner of Correction and shall be published in the Unit Directives of the affected facilities.

17. <u>Exceptions</u>. Any exceptions to the procedures in this Administrative Directive shall require prior written approval from the Commissioner.